Ralph C. Gorrill v. Commissioner.
Gorrill v. Commissioner
Docket No. 93801.
United States Tax Court
T.C. Memo 1963-168; 1963 Tax Ct. Memo LEXIS 176; 22 T.C.M. (CCH) 804; T.C.M. (RIA) 63168; June 17, 1963
Joseph Bertain and Joseph L. Alioto, 111 Sutter St., San Francisco, Calif., for the petitioner. Robert H. Elliott, Jr., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined deficiencies in income tax against the petitioner for the years 1957 and 1958 in the amounts of $8,291.58 and $7,494.98. The only question for decision is the amount which would represent a reasonable allowance for petitioner's personal services in 1957 and 1958 in managing a family partnership. Findings of Fact Petitioner resides at Chico, Butte County, California. He filed his income tax returns for the years 1957 and 1958 with the district director of *177 internal revenue at San Francisco, California. Petitioner has been engaged in growing rice in California since 1918 or 1919. The land on which the rice farming was conducted was leased at first and then acquired by petitioner. At and for some undisclosed period prior to 1942, petitioner's farmland holdings, located near Durham in Butte County, amounted to 2,700 [1] acres. In 1942, he gave a 20 percent interest in the land to each of his three daughters. Since that time the land has been farmed by a partnership, R. Gorrill Ranch Enterprises, composed of petitioner and his three daughters. At all times, petitioner has been and has served as managing partner. His daughters have not at any time actively engaged in the management of the farm or the rice growing operations. During the taxable years the rice growing operations were conducted under a partnership agreement, dated August 31, 1951. Under that agreement, petitioner was designated and appointed to operate the properties and was given full and complete power and authority to act for and on *178 behalf of all the parties in the operation and management of the farm, including the purchase of seed, fertilizer, equipment and necessary supplies, the employment of labor and other services, and "the performance of all acts necessary for the proper management and operation of said properties, except that all purchases of equipment at a cost in excess of ONE THOUSAND (1,000.00) DOLLARS shall be approved by parties owning a majority interest" in the properties. [2] The consideration for the services of petitioner was fixed at $8,000 per year, and it was recited that this compensation "shall constitute an expense and shall be deducted from the income derived from said properties in the determination of the net income which is divisible" among the partners. The 1951 partnership agreement is to continue on a year-to-year basis until the holders of the majority interests in the properties determine that it shall be terminated, or petitioner resigns. At the date of trial the agreement had not been terminated, and petitioner had not resigned. Notwithstanding the provision which fixed the consideration for petitioner's services at $8,00 per year, petitioner had drawn only $7,000 per year *179 up to the date of trial. Petitioner became 73 years of age in 1958. The growing of rice is carried on under an acreage allotment from the United States Department of Agriculture. At all times material, the allotment of R. Gorrill Ranch Enterprises was approximately 1,100 acres of land. The number of acres of good rice land owned by the partnership was approximately double the allotment. As a consequence, the same land was planted in rice about every other year. The regular employees engaged in the rice growing operations numbered four or five. Extra help was employed in the spring to help in the preparation of the soil for planting. In the fall, during the harvest season, 14 to 16 additional individuals were employed. As a general rule, there was little work to be performed in the months of January and February. Machinery would be repaired if it needed repairing. The situation was somewhat the same in March. Plowing, discing and harrowing of the land in preparation for planting the rice would start in April. Extra men were employed during that period as tractor drivers. As a need arose, levees would be thrown up irregularly across the land to a height of 12 to 18 inches for *180 the purpose of holding the water when the land should be flooded. Generally levees would last four to six years. After the land was prepared, fertilizer was applied through the use of airplanes. That operation was performed under contract with a private airplane company. After the fertilizing, the land would be flooded. The next operation was the sowing of the seed. This likewise was done by plane, under contract with the airplane company. Petitioner would have the company notified when the land was in readiness for fertilizing and the sowing of seed. The airplane company not only served petitioner but other growers and would work the job to be done for petitioner into its schedule. In selecting the fertilizer to be used, petitioner relied substantially on the recommendations of the Rice Experiment Station. Whenever in doubt, petitioner consulted with the people at the Experiment Station. [3]
From the sowing of the seed until just prior to harvest, the principal activity was that of controlling the water to assure *181 that the flooding was at the proper depth. The water would be taken off as a general rule about the middle of September to allow the land to dry properly for harvesting. The rice continues to ripen until about the end of September. Harvesting as a general rule starts about the first of October. The harvesting was done by machines which had their own motive power and were self-propelling. They cut as much of the straw as was necessary to harvest the grain and then separated the grain from the straw and chaff, the straw and chaff being discarded. The grain was run into a bin, which, dependent on the size of the tractor, had a capacity of 50 to 100 sacks of rice. The term "sack" is used to represent one hundred pounds of rice. The rice was not actually put in sacks. The rice was next transported by trucks to the dryer, after which it went into elevators, where it remained until moved in the course of marketing. The dryers and elevators so used were owned by the partnership. Rice as it thus goes into elevators is referred to as paddy rice. In preparing the soil, harvesting and other operations, aside from the fertilizing and seeding of the land, partnership owned equipment was used. *182 The partnership owned four harvesters. Two were larger in size and cut a 20-foot swath. They had a capacity to harvest approximately 30 acres of rice per day. The two smaller harvesters cut a swath of approximately 16 feet. When rice is ripe, the time of harvesting is determined by the moisture content of the rice. Harvesting is delayed until the moisture content is down to approximately 24 percent. The partnership is and during the taxable years was a member of the Rice Growers Association of California. The association has approximately 1,500 rice grower members and markets approximately 60 percent of the rice grown in California. It owns five rice mills, in which it conducts substantial rice milling operations. It also offers information and advice with respect to various aspects of the rice growing operations, such as the selection of seed and fertilizer. Petitioner individually became a member of the Rice Growers Association in 1925, and has been a member since that time. He became a director of the association in 1950 and was still serving in that capacity at the date of trial herein. The number of directors, according to the by-laws, is 25. The association by-laws require *183 that each member market his rice through the association and fix the rate of damages for failure to comply with that requirement. Prior to December 31 of the year in which the crop is grown, a member is required to file with the association a statement of the number of pounds of paddy rice owned or controlled by him and delivered or to be delivered to the association. It is provided that the association may pool all or any rice delivered to it in one or more pools and may sell the rice in paddy form or may mill the rice before selling it. After deduction of all costs, all expenses, provision for reserves and dividends, the proceeds from the sale of the rice are distributed to the pool participants. Each grower regularly signs a form of contract with the association, referred to as the buyer, to "sell" and deliver to the association "upon harvesting" all of the rice produced by him. The contract also recited that the grower is to receive the net resale proceeds. Pursuant to the by-laws of the Rice Growers Association and the contract, the partnership delivered 45,552 hundredweight of rice to the association in 1957, and 42,554 hundredweight in 1958. Based upon a rate of 10 cents per *184 bag or hundredweight, the partnership paid $4,522 in 1957 and $4,244 in 1958 to the association for the services performed by it for the partnership. Working under petitioner and subject to his control as manager were two supervisory employees, one the foreman and the other the irrigator. They were permitted to exercise their own judgment and discretion with respect to matters normally falling within the scope of their employment, but in the performance of all their duties they were under the supervision and control of petitioner as general manager. The foreman, for his services, received $5,200 in 1957 and $5,800 in 1958. The irrigator received approximately $5,000 for each of the years 1957 and 1958. The net profits reported by the R. Gorrill Ranch Enterprises for 1955 were $103,981.49, and for 1956 were $125,789.23. For 1957 it reported gross income of $254,057.96 and a net profit of $135,219.05. For 1958, gross income of $222,607.88 was reported, and a net profit of $113,266.05. Petitioner at all times pertinent herein, including the years 1957 and 1958, was a highly skilled, experienced and successful rice grower. A reasonable yearly allowance for his services as manager *185 of R. Gorrill Ranch Enterprises was $16,000 per year. In his income tax returns, petitioner computed and reported his income from R. Gorrill Ranch Enterprises by combining the $7,000 drawn as compensation for the managerial services rendered by him with a two-fifths share of the partnership income, computed after deducting from partnership income the $7,000 drawn as compensation. In his determination of deficiencies, the respondent determined that $20,000 was reasonable compensation for the services rendered to the partnership by petitioner as managing partner, and treated $20,000, plus a two-fifths share of partnership income, computed after deducting from partnership income $20,000 as compensation to petitioner for the services he had rendered, as petitioner's income from R. Gorrill Ranch Enterprises. Opinion By section 704(e)(2) of the Internal Revenue Code of 1954, it is provided that "In the case of any partnership interest created by gift, the distributive share of the donee under the partnership agreement shall be includable in his gross income, except to the extent that such share is determined without allowance of reasonable compensation for *186 services rendered to the partnership by the donor." It follows that the share of the donor partner in the partnership income is inclusive of an allowance of reasonable compensation for the services rendered by him to the partnership. The facts show that the partnership interests of petitioner's daughters were created by gift from petitioner. They further show that in the partnership agreement it was specified that petitioner was to receive $8,000 per year for his services as manager, but that he actually drew as such compensation only $7,000 a year, which was the amount used in computing the distributive share of partnership income reported by him in his 1957 and 1958 income tax returns. The facts also show that petitioner did serve as manager and the donee partners rendered no services. The respondent has determined that the reasonable compenstation for the services rendered by petitioner to the partnership as its manager was $20,000 per year. The petitioner does not offer strong resistance to the use of $8,000 rather than $7,000 as the allowance of reasonable compensation for his services, for the purpose of determining his distributive share of partnership income. He does resist *187 the use of any greater amount. His counsel, in their argument, appear to picture petitioner as more or less the nominal manager of the partnership and seek to elevate the foreman and irrigator to the position of farm manager, at least with respect to that part of the operations where their duties lay. They also stress the fact that the Rice Growers Association, to which the partnership belonged, rendered services which in the absence of such membership would be the responsibility of the farm manager, the major service being the marketing of the rice crop. There is also some implication that the valuation of petitioner's services should be discounted when the petitioner's age during the years in question is taken into account. The respondent offered the testimony of an agricultural economist of some fifteen years of experience, the last seven of which were with the Agricultural Extension Service at Davis, California, as to reasonable compensation for farm managers in California. Based on his experience and studies, his opinion testimony supported the respondent's determination. He testified that his studies indicated that the compensation of farm managers in California ranged from five *188 to ten percent of the gross receipts from the farming operations. The gross receipts from rice sales as reported by R. Gorrill Ranch Enterprises were $254,057.96 for 1957 and $222,607.88 for 1958. We have examined and considered the evidence, and there can be no doubt that petitioner was and had been very successful in his career as a rice farmer. We are satisfied and convinced that through the years herein and up to the date of trial, he continued to be a very capable and effective manager in the growing of rice in California and that he functioned as such. As such manager, it would be expected that he would search out and employ an efficient foreman and irrigator, and we do not doubt that the men so employed by petitioner performed their duties well. We are satisfied, however, that they worked under petitioner's supervision and control and that he did not relinquish to them his functions and responsibilities as manager. Also, we had occasion to observe petitioner in the course of his appearance and testimony at the trial herein. There was nothing apparent on which to base any conclusion that his skill and effectiveness as manager had been in any way lessened by the fact that during *189 the taxable years he became 72 and 73 years of age and by the date of trial was approaching his 77th birthday. It is also to be noted that he was still being retained as one of the directors of the Rice Growers Association, which in its operations represented 60 percent of the rice production in California. It does appear, however, that some allowance should be made for the fact that his managerial activities did not extend to the marketing of the crop, but ended when the rice had been produced and had reached the elevators. Thereafter it was subject to the control and orders of the Rice Growers Association. And in final settlement the partnership, as were the other members of the association, was charged for the services rendered according to the costs incurred in rendering the services. Having considered the evidence presented, we are of the opinion and have concluded and found that reasonable compensation to petitioner for the services rendered by him to R. Gorrill Ranch Enterprises in 1957 and 1958 was $16,000 a year. Decision will be entered under Rule 50. Footnotes
1. This figure is as stipulated by the parties. It was petitioner's testimony that the correct acreage was approximately 3,500 acres.↩
2. According to the testimony of petitioner, he made all decisions for the purchase of machinery and equipment, and there is no evidence or claim that any of the partners or anyone else participated in those decisions.↩
3. This finding is from the testimony of the petitioner. Presumably the experiment station referred to was a station operated by the Department of Agriculture.↩